```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
  KIRK A. SWANSON,                              :
                              Plaintiff,        :
                                                :
              -v-                               :         15-CV-6938 (JPO)
                                                :
  BATTERY PARK CITY AUTHORITY and               :         OPINION AND ORDER
  SHARI HYMAN,                                  :
                              Defendants.       :
-------------------------------------------------------------X
```

J. PAUL OETKEN, District Judge:

Plaintiff Kirk Swanson brings this action against the Battery Park City Authority (BPCA) and Shari Hyman, alleging that he was terminated from his job at the BPCA in retaliation for engaging in various forms of protected conduct. (Dkt. No. 9.) Swanson asserts claims for retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, the New York City Human Rights Law, the New York City Administrative Code, § 8-107, *et seq.*, and the New York False Claims Act (NYFCA), N.Y. State Fin. Law § 191. Defendants move to dismiss Plaintiff's NYFCA claim for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). For the reasons that follow, the partial motion to dismiss is denied.

**I.   Background**

The following facts are drawn from the Amended Complaint and are presumed true for the purposes of this motion. Swanson was employed at the BPCA from November 2012 to May 2014, serving in several positions. (Dkt. No. 9 ¶ 2.) In November 2012, Swanson was hired by the BPCA to serve as Deputy Chief Administrative Officer, and was also given the titles of Internal Controls Officer and, later, Chief Contracting Officer. (*Id.* ¶ 12.) In this capacity, his "responsibilities included general administration, compliance, and diversity."

(*Id.*)  In March 2013, Swanson was promoted to Chief Administrative Officer.  (*Id.*)  In December 2013, he was promoted to Vice-President of Administration, which entailed new responsibilities, although he retained his roles as Chief Contracting Officer and Internal Controls Officer.  (*Id.* ¶ 13.)

As relevant here, in February 2014, Swanson "discovered that high-level BPCA employees were making false statements in an effort to bypass the BPCA's contract approval process."  (*Id.* ¶ 26.)  Specifically, in March 2014, Kevin McCabe, Special Assistant to the Chairman of the BPCA, advised Swanson that Hyman—the President of the BPCA—"wished to expedite a redesign of the website of the BPCA and its affiliate the Battery Park Conservancy."  (*Id.* ¶ 27.)  McCabe indicated that Hyman was intent on picking a particular vendor for the project: Revolver Studios.  (*Id.* ¶ 28.)

McCabe informed Swanson that "Hyman wished to bypass the BPCA contracting procedure, which would have required a formal Request for Proposal and three competitive bids, by designating the contract as a 'discretionary procurement.'"  (*Id.* ¶ 28.)  Because "BPCA regulations only permit contracts involving expenditures of less than $50,000" to be so designated, BPCA officials "falsely characterized the one contract with Revolver as two contracts each with a value of under $50,000: one for the BPCA website and one for the Battery Park Conservancy website" (the "Revolver Contracts").  (*Id.* ¶ 29.)

Swanson told McCabe that, under the BPCA guidelines, even discretionary procurements required the obtainment of additional bids.  (*Id.* ¶ 30.)  McCabe, however, "obtained only one additional bid, which appeared not legitimate based on the absence of documentation."  (*Id.* ¶ 30.)  Swanson "protested to Mr. McCabe that the situation was 'utterly bogus.'"  (*Id.* ¶ 31.)  Swanson also learned that work on the website projects had begun prior to the contract's being approved, "in violation of the BPCA procedures."  (*Id.*)  Swanson

2

"expressed his continued objections" to McCabe understanding that they would be relayed to Hyman and BPCA Chairman Dennis Mehiel. (*Id.*)

In March 2014, Seema Singh, then Acting General Counsel of the BPCA, "was attempting to get approval for the amendment of a contract that the BPCA had entered into in February 2014, with a law firm, Liddle & Robinson LLP" (the "Liddle & Robinson Contract"). (*Id.* ¶ 33.) Swanson discovered that the Liddle & Robinson Contract "had not been presented for approval to the BPCA Contract Selection Committee" as "was required by the BCPA contract approval process" and that Singh had stated in contract documents that the firm was "pre-qualified legal counsel" despite the fact that the law firm was not "pre-qualified." (*Id.* ¶ 34.) Swanson also learned that Singh had "further bypassed the BPCA contracting process" because the contract was approved by Swanson's deputy while Swanson was out of the office on vacation, rather than by Swanson himself. (*Id.*)

On April 8, 2014, Swanson sent Singh an email about the Liddle & Robinson Contract. (*Id.* ¶ 35.) The email requested that Singh "prepare a 'memo to file' acknowledging that she was responsible for violations of the BPCA procurement guidelines and that the violation had occurred without the knowledge [of] Mr. Swanson and the BPCA Contract Selection Committee." (*Id.*) On April 11, 2014, three days after he sent the email to Singh, Swanson was terminated. (*Id.* ¶ 36.) "Among the reasons given by Ms. Hyman for the termination was that email." (*Id.*)

## II. Discussion

### A. Motion to Dismiss Standard

In order to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads

3

factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must accept as true all well-pleaded factual allegations in the complaint and "draw[] all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus*, 433 F.3d 248, 249–50 (2d Cir. 2006) (internal quotation marks omitted).

### B.   New York False Claims Act Retaliation

Congress enacted the False Claims Act (FCA) in response to the disclosure of "widespread fraud" by defense contractors during the Civil War. *Mikes v. Straus*, 274 F.3d 687, 692 (2d Cir. 2001); *see United States v. McNinch*, 356 U.S. 595, 599 (1958). The NYFCA is closely modeled on the FCA. *See Kane ex rel. United States v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 381 (S.D.N.Y. 2015); *Garcia v. Aspira of New York, Inc.*, No. 07-CV-5600, 2011 WL 1458155, at *3 n.2 (S.D.N.Y. Apr. 13, 2001). Accordingly, "[c]ourts interpret [NYFCA provisions] by closely tracking judicial interpretation of its federal counterpart." *Landfield v. Tamares Real Estate Holdings, Inc.*, 2012 N.Y. Misc. LEXIS 3612, at *6 (N.Y. Sup. Ct. 2012); *see Kane*, 120 F. Supp. 3d at 381.

Swanson alleges that his termination constituted retaliation against a "whistleblower" in violation of the NYFCA. N.Y. State Fin. Law § 191. The whistleblower provision of the FCA is "intended to protect persons who assist in the discovery and prosecution of fraud, because few individuals will expose fraud if they fear their disclosures will lead to harassment, demotion, loss of employment, or any other form of retaliation." *Garcia*, 2011 WL 1458155, at *3 (quoting *Faldetta v. Lockheed Martin Corp.*, 98-CV-2614, 2000 WL 1682759, at *11 (S.D.N.Y. Nov. 9, 2000)); *see McAllen v. Von Essen*, 517 F. Supp. 2d 672, 685 (S.D.N.Y. 2007). The whistleblower provision of the NYFCA is "essentially identical in language and substance to its federal counterpart," *Forkell v. Lott Assisted Living Corp.*, 2012 WL 1901199,

4

at *13 (S.D.N.Y. May 21, 2012), and protects, in relevant part, "[a]ny current or former employee . . . of any private or public employer who is discharged . . . because of lawful acts done by the employee . . . in furtherance of [1] an action brought under the [NYFCA] or [2] other efforts to stop one or more violations of [the NYFCA] . . . ."[1]  N.Y. State Fin. Law § 191(1).

To state a retaliation claim under the NYFCA, a plaintiff employee must allege that "(1) the employee engaged in conduct protected under the [NYFCA]; (2) the employer knew that the employee was engaged in such conduct; and (3) the employer discharged, discriminated against or otherwise retaliated against the employee because of the protected conduct." *Garcia*, 2011 WL 1458155, at *3 (quoting *McAllen*, 517 F. Supp. 2d at 685); *see Grant v. Abbot House*, No. 14-CV-8703, 2016 WL 796864, at *7 (S.D.N.Y. Feb. 22, 2016); *Forkell*, 2012 WL 1901199, at *9.

1. **Protected Conduct**

Defendants contend that Swanson has not sufficiently alleged that he engaged in protected conduct under the NYFCA.  The category of protected conduct is "interpreted broadly," *Garcia*, 2011 WL 1458155, at *4, and encompasses "two kind[s] of conduct: (1) lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under the FCA, and (2) other efforts to stop one or more violations of the FCA."[2]

---

[1] The analogous provision of the FCA provides, as relevant here, that "[a]ny employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged . . . because of lawful acts done by the employee . . . in furtherance of [1] an action under this section or [2] other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h).

[2] Although the FCA "has long prevented employers from terminating employment for conduct that is 'in furtherance of an [FCA claim][,]' . . . . [i]n 2009, Congress amended the [FCA] to protect employees from being fired for undertaking 'other efforts to stop' violations of the Act, such as reporting suspected misconduct to internal supervisors." *Halasa v. ITT Educ. Serv., Inc.*,

*Malanga v. NYU Langone Med. Ctr.*, No. 14-CV-9681, 2015 WL 7019819, at *2 (S.D.N.Y. Nov. 12, 2015) (citation and internal quotation marks omitted).  In this second category, "a retaliation claim can be stated so long as the employee was engaged in efforts to stop an FCA violation, even if the employee's actions were not necessarily in furtherance of an FCA claim." *Id.* at *3.

While protected conduct must be "in furtherance of an action" under the NYFCA or "other efforts to stop one or more violations" of the NYFCA, and therefore a plaintiff must allege that his actions were related to a plausible, underlying NYFCA violation, "a plaintiff need not plead his fraud allegations with particularity." *Fisch v. New Heights Acad. Charter Sch.*, No. 12-CV-2033, 2012 WL 4049959, at *6 (S.D.N.Y. Sept. 13, 2012).  Rather, a plaintiff "is required to show a 'good faith basis,' or 'objectively reasonable basis,' for believing that he or she was investigating matters in support of a viable FCA case." *U.S. ex rel. Sasaki v. New York Univ. Med. Ctr.*, No. 05-CV-6163, 2012 WL 220219, at *12 (S.D.N.Y. Jan. 25, 2012) (quoting *Hoyte v. Am. Nat'l Red Cross*, 518 F.3d 61, 67 (D.C. Cir. 2008)).  It is not "necessary for [the plaintiff] to 'know' that the investigation he was pursuing could lead to a False Claims Act suit." *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 741 (D.C. Cir. 1998) (Garland, J.).

In support of Swanson's view that he has made the "requisite allegation of unlawful conduct under the NYFCA," he points to three specific allegations in his Complaint: (1) that the Revolver Studios project was "falsely characterized" as two contracts in order to be designated a "discretionary procurement" under "the BPCA contracting procedure"; (2) that,

---

690 F.3d 844, 847-48 (7th Cir. 2012); *see Farnsworth v. HCA, Inc.*, No. 15-CV-65-T-24, 2015 WL 5234640, at *3 (M.D. Fla. Sept. 8, 2015).  By an amendment that became effective on August 27, 2010, the NYFCA was similarly expanded to cover "efforts to stop one or more violations of this article." N.Y. State Fin. Law § 191(1).

although "BPCA guidelines required obtaining additional bids" for the Revolver Contracts, "only . . . one additional bid, which appeared not legitimate based on the absence of documentation" was procured; and (3) that Seema Singh stated in "contract documents that Liddle & Robinson was 'pre-qualified legal counsel' even though the law firm was not prequalified." (Dkt. No. 9 ¶¶ 28-29; 33-34; Dkt. No. 17 at 6.)  These allegations, Swanson contends, constitute violations of Sections 189(b) and (c) of the NYFCA, which impose liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" or "conspires" to do so.  N.Y. State Fin. Law §§ 189(b)-(c); *see generally Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 87 (D.C. Cir. 2014) (describing "false statement actions" actions under the analogous provision of the FCA).

Specifically, Swanson puts forward a "fraudulent inducement" theory of liability.  (*See* Dkt. No. 17 at 7-8.)  Under this theory, "courts have repeatedly held that the 'use of fraudulent information to induce the Government to provide' a contract 'constitutes a false claim under the FCA."  *United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 593, 623 (S.D.N.Y. 2013) (quoting *United States v. Eghbal*, 538 F.3d 1281, 1283 (9th Cir. 2008) (collecting cases)).  As applied here, Swanson alleges that the "false statements" outlined above "were made about the proposed government contractors in an effort to induce the BPCA to award contracts."  (Dkt. No. 17 at 8.)  *See Mikes v. Straus*, 274 F.3d 687, 692 (2d Cir. 2001)

False certification, another theory of FCA liability, is also relevant.  "[T]he Second Circuit, in delineating the contours of what renders a claim 'false'" under this category of FCA liability, "has distinguished between claims that are 'factually false' and those that are 'legally false.'"  *United States ex. rel. Feldman v. City of New York*, 808 F. Supp. 2d 641, 651 (S.D.N.Y. 2011) (citing *Mikes,* 274 F.3d at 696-98).  Factually false certification "involves an

7

incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *Mikes*, 274 F.3d at 697.  Legally false certification, in contrast, "is predicated upon a false representation of compliance with a federal statute or regulation or a prescribed contractual term." *Id.* at 696.  "Legally false certifications may, in turn, be *express,* or they may be *implied* by submission of the claim itself." *Wells Fargo*, 972 F. Supp. 2d at 622.  Nonetheless, not every instance of regulatory non-compliance amounts to a legally false certification.  *Mikes*, 274 F.3d at 697 ("While the FCA is 'intended to reach all types of fraud, without qualification, that might result in financial loss to the Government,' *United States v. Neifert–White Co.,* 390 U.S. 228, 232 (1968), it does not encompass those instances of regulatory noncompliance that are irrelevant to the government's disbursement decisions."); *see Hoyte*, 518 F.3d at 67.  Rather, "a claim under the [FCA] is legally false only where a party certifies compliance with a statute or regulation as a condition to governmental payment." *Mikes*, 274 F.3d at 697.

Defendants argue that Swanson has failed to identify a predicate violation of the NYFCA because he has "merely allege[d] a failure of government employees to comply with their own procurement guidelines, an act that does not rise to the level of a 'false claim' under the NYFCA." (Dkt. No. 19 at 4.)  To be sure, in his Complaint, Swanson characterizes the complained-of conduct as "an effort to bypass the BPCA contract approval process" and his own efforts as an attempt "to ensure that the approval process was followed." (Dkt. No. 9 ¶ 5.)  However, neither party has shed light on the relationship between the BPCA's internal guidelines, on the one hand, and state and federal rules governing the BPCA's disbursal of funds on the other. *See Feldman*, 808 F. Supp. 2d at 651-52.  Nor have the relevant BPCA guidelines been submitted to the Court for an evaluation of whether the conduct alleged ran afoul of its strictures.  For example, the Court cannot, at this stage, determine whether the

8

allegedly false characterization of Liddle & Robinson as "pre-qualified" was a "condition to government payment" within the scope of the false certification doctrine. *Mikes*, 274 F.3d at 697. These questions, among others, may be relevant to the ultimate disposition of Swanson's retaliation claim. *See Pitts v. Howard Univ.*, 111 F. Supp. 3d 9, 17 (D.D.C. 2015) (Boasberg, J.) ("[T]he line between "merely" policing regulatory compliance, on the one hand, and investigating fraud, on the other, can be a hazy one—and the inquiry is fact specific.").

Absent clarification on these matters, the Court cannot conclude that Swanson has failed to allege a predicate violation of the NYFCA, particularly because he need only "show a 'good faith basis,' or 'objectively reasonable basis,' for believing that he . . . was investigating matters in support of a viable FCA case." *Sasaki*, 2012 WL 220219, at *12 (quoting *Hoyte*, 518 F.3d at 67). It follows that Swanson has adequately alleged that he engaged in protected conduct under the NYFCA. *Garcia*, 2011 WL 1458155, at *3 (quoting *McAllen*, 517 F. Supp. 2d at 685).

### 2. Notice

To state a retaliation claim under the NYFCA, a plaintiff must also allege that "his employer was aware that he was engaged in" protected conduct. *Weslowski v. Zugibe*, 626 F. App'x 20, 21 (2d Cir. 2015); *see Sasaki*, 2012 WL 220219, at *12; *Garcia*, 2011 WL 1458155, at *3. After all, in order for a plaintiff to show that she was retaliated against for activity protected under the NYFCA, the defendant must know that she was engaged in protected activity. *See Yesudian*, 153 F.3d at 742. The requisite "standard for notice . . . is flexible: 'the kind of knowledge the defendant must have mirrors the kind of activity in which the plaintiff must be engaged.'" *United States ex rel. Williams v. Martin-Baker Aircraft Co.,* 389 F.3d 1251, 1260-61 (D.C. Cir. 2004) (Tatel, J.) (quoting *Yesudian*, 153 F.3d at 742).

9

Many courts, including the D.C. Circuit, have held that "plaintiffs alleging that performance of their normal job responsibilities constitutes protected activity must 'overcome the presumption that they are merely acting in accordance with their employment obligations' to put their employers on notice." *Williams*, 389 F.3d at 1261 (quoting *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 568 (6th Cir. 2001)); *see, e.g., Fisch*, 2012 WL 4049959, at *6 ("Naturally, an employee who simply engages in behavior wholly consistent with his job description will not, without more, provide notice that he is acting 'in furtherance' of an FCA action.") (quoting *Eberhardt v. Integrated Design & Const., Inc.*, 167 F.3d 861, 868-69 (4th Cir. 1999)); *United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1523 (10th Cir. 1996) ("[T]he monitoring and reporting activities described in plaintiff's complaint were exactly those activities plaintiff was required to undertake in fulfillment of her job duties, and plaintiff took no steps to put defendants on notice that she was acting 'in furtherance of' an FCA action."). Following this authority, in *United States ex rel. Schweizer v. Océ N.V.*, 667 F.3d 1228, 1239 (D.C. Cir. 2012), the D.C. Circuit observed that an employee whose "job was to ensure compliance with government contracts" could not succeed in her retaliation claim "unless she alerted [defendant] of her protected conduct by acting outside her normal job responsibilities, notifying a party outside the usual chain of command, advising [defendant] to hire counsel, or taking any [other] action which a factfinder reasonably could conclude would put [defendant] on notice that litigation [was] a reasonably possibility." (internal quotation marks and citation omitted).

More recently, however, some courts have observed that "it is doubtful that those heightened [standards for notice] survive [the 2009 amendments to the FCA and analogous revisions to the NYFCA]" as the decisions propounding the heightened standard "were concerned with ensuring that the employer was on notice of an employee's intentions of

10

*bringing or assisting in an FCA action*," while the 2009 amendments broadened the scope of the FCA's whistleblower provision to protect against retaliation in cases where "the employee was engaged *in efforts to stop an FCA violation*, even if the employee's actions were not necessarily in furtherance of an FCA claim."[3] *Malanga*, 2015 WL 7019819, at *3 (emphasis added); *accord United States ex rel. Feaster v. Dopps Chiropractic Clinic, LLC*, No. 13-CV-1453, 2015 WL 6801829, at *8 (D. Kan. Nov. 5, 2015) ("[W]hat constituted notice of activity protected under § 3730(h)'s prior version no longer precisely controls what constitutes notice of activity newly protected under the current § 3730(h).  Notice of the second sort exists if the employee's actions—including warnings of regulatory noncompliance and false reporting—suggest to the employer that the employee was seeking specifically to prevent fraud on the government.").

       Defendants argue that Swanson has failed to allege that the BPCA was sufficiently on notice of his protected conduct because "[i]t is abundantly clear . . . that [Swanson] was acting within the scope of his duties and responsibilities" as Chief Contracting Officer and Internal Controls Officer "when he allegedly complained about violations of the BPCA's contract procurement guidelines."  (Dkt. No. 12 at 10.)  In response, Swanson argues (1) that the recent amendments to the NYFCA, outlined above, disposed of heightened notice requirements where the protected conduct in question involves "efforts" to stop NYFCA violations rather than actions "in furtherance of" an NYFCA action, and (2) that, even if a heightened notice standard is appropriate, Swanson went beyond his normal job responsibilities and "went outside the chain of command to express his objections to the fraudulent statements" at issue, thereby putting the BPCA on notice.  *Schweizer*, 667 F.3d at 1239.

---

[3] As detailed above, the 2009 amendments to the FCA were followed by analogous changes to the NYFCA.

It is unnecessary to resolve whether a heightened notice standard applies to an employee in Swanson's position because, even assuming it does, the Court cannot discern from the allegations in the Complaint whether Swanson's actions were wholly "within his responsibilities" or involved reporting "outside the usual chain of command."  *Schweizer*, 667 F.3d at 1239.  These open questions require factual development and render dismissal inappropriate at this stage.  *See Malanga*, 2015 WL 7019819, at *3 ("Accepting her allegation as true, this Court cannot determine whether Malanga qualified as a 'fraud alert' employee on this [12(b)(6)] motion."); *Feaster*, 2015 WL 6801829, at *8; *see also Williams*, 389 F.3d at 1262; *United States v. Americare, Inc.*, No. 06-CV-1806, 2016 WL 1212775, at *2 (E.D.N.Y. Mar. 8. 2016); *Pitts*, 111 F. Supp. 3d at 19-20.  Accordingly, Swanson has adequately alleged that the BPCA was aware that he was engaged in protected conduct.  *Weslowski*, 626 F. App'x at 21.

### 3. Retaliatory Action

Finally, to state a retaliation claim under the NYFCA, a plaintiff must allege that "the employer discharged, discriminated against or otherwise retaliated against the employee *because of* the protected conduct."  *Garcia*, 2011 WL 1458155, at *3 (quoting *McAllen*, 517 F. Supp. 2d at 685) (emphasis added).  Given the temporal proximity between Swanson's email to Singh and his termination, as well as Swanson's allegation that Hyman cited the email to Singh as a reason for the termination, Swanson has—for the purposes of surviving a motion to dismiss—satisfied this requirement.  *See Garcia*, 2011 WL 1458155, at *5 ("At the motion to dismiss stage, the temporal proximity of plaintiff's statement . . . is a sufficient basis to permit the claim to go forward."); *see also McAllan*, 517 F. Supp. 2d at 686 (noting the absence of "temporal proximity" in determining that there was no nexus between the challenged employment action and protected conduct); *Forkell*, 2012 WL 1901199, at *12 (same).

**III.     Conclusion**

For the foregoing reasons, Defendants' partial motion to dismiss Swanson's NYFCA retaliation is DENIED.  Defendants shall file an amended answer addressing Swanson's NYFCA claim within 21 days of the date of this Order.

The Clerk of Court is directed to close the motions at docket numbers 7 and 11.


SO ORDERED.


Dated: June 8, 2016
       New York, New York

_____
J. PAUL OETKEN
United States District Judge